Suture, C.J.
We have no doubt that the deed of conveyance executed by John H. Piatt to William Smith, in December, 1821, was, at the time of its execution, regarded by the parties as a deed in the nature of a mortgage. This is clearly shown by all the circumstances, and is plainly expressed by the written memorandum, executed by the parties at the time of the transaction. Indeed, the legal import and effect of the contract of the parties to the deed, as shown by the memorandum, would be to make the deed a conveyance as security for the repayment of the loan, and interest, as evidenced by the promissory note. This is the language of the instrument: *568 “As a collateral security to the said Smith, the said Piatt has made a deed to him, the said Smith, his heirs,” etc. And in relation to the terms and conditions of the deed of conveyance, the understanding between the parties is thus expressed: “Now should the aforesaid money so lent, as aforesaid, not be paid, with its interest, at the time specified for the payment thereof, in a note given therefor by the said Piatt to the said Smith, then he, the said Piatt, abandons all claim whatsoever to the premises.deeded as aforesaid, either in law, equity or otherwise.”
Nor is there any doubt, from the proof, that the grantor, Smith, after' the note had fallen due, was very willing, and desirous, to receive from the representatives of Piatt, the grantor, the amount of the loan and interest, and to reconvey the lands. Nor have ..we any doubt that the conveyance was one to be regarded so far in the nature of a mortgage, and that its object was merely to afford a perfect security for the repayment, at maturity, of the loan and interest,, that even if Smith had been unwilling, the representatives of Piatt after his death and after the note had fallen due, might, within a reasonable time, have tendered to Smith the amount, principal and interest, due upon the loan according to the terms of the note, and upon petition in chancery, have been allowed the right of redemption, or a reconveyance of the lands, upon showing them to be of greater value than the amount due upon the loan.
But it is not true of a deed like this, made for the purpose of security, and so in the nature of a mortgage, that all the incidents of a mortgage adhere to it. In the case of a mortgage the equity of redemption is inherent in the land. And in most cases, a court of equity will regard this inherent equitable right, the equity of redemption existing in the case of a mortgage, as the fee simple of the land; whereas, the trust arising under such a deed as the present, is collateral to the land, created by the contract of the parties,, as in this case, a contract binding in law' as well as in equity upon the party. In the case of a mortgage, the mortgagor or the person entitled to the equity of redemption being considered as *569 the owner of the land, the mortgagee is regarded only as holding the same in pledge. But, in the case of an absolute conveyance, as in this case, and a collateral contract for the reconveyance, neither in equity nor law can the grantor thereafter be regarded the owner of the land until he shall have performed the condition, or paid the consideration, according to the terms of such collateral contract, thereby entitling himself to a reconveyance of the land. Whatever right the grantor has in the lands, after having so conveyed the same and entered into a special contract, is to be regarded ■as expressed by such contract. His interest would be held by virtue of such contract in a very similar, if not precisely the same, manner at the time of making the contract, that it would be if the grantor had received the land from some •other source. The legal rights of the party would be the same in each ease. But the party having, by accident or laches, neglected to perform his part of the contract within the time named, and thus having lost his legal right to demand legal redress against the other party for refusing to accept performance, after the time named, and to convey the land; the facts, if such they are, that the land was conveyed to the grantee as a pledge by the other party, or for much less than their actual value, upon the other party undertaking to reconvey at the same price, might constitute a very material equity, or ground for relief in a court of equity, which the party would not otherwise have. To recur, then, to the case before us, does the case as presented by the record and p-roofs entitle the complainants to the relief sought, the full benefits of the collateral contract, as if the same had been performed according to the terms thereof by the grantor in his lifetime ?
It is always incumbent upon the party asking the interposition of a court of equity in his behalf, to show a perfect equity. That is to say, the party asking relief in a court of equity must present such a state of facts, as, in equity and good conscience, would, according to the rules of courts of. equity, seem to require the granting of relief, to prevent an undue advantage being gained of him by another, or to pre *570 vent Ms suffering an irreparable injury; and that, without being chargeable to his own wrong, or even delinquency.
In the first place, then, regarding the transaction as a loan of money and a conveyance of land-in the nature of a mortgage to secure repayment, and how stood the equities at the time of Smith’s taMng possession of the lands ?
If Smith had been called upon by Piatt, one year after the expiration of the time limited by their contract, to perform the contract, and Smith had refused, it certainly may well be questioned whether Piatt, the grantor, could, in chancery have enforced a performance upon the same state of facts shown in this case to have existed at that time in relation to the contract. No facts are stated or proved explaining the delinquency of Piatt or his representatives, to perform his part of the contract according to its terms. Nor is it either averred or proved that the land was in fact worth as much as the money so to have been paid, to entitle him to a reconveyance.
But even conceding the right to have existed in the grantor* after the expiration of the time limited by the contract, to tender the money due on the note and have a reconveyance of the lands decreed in a count of equity, the assertion of the-right must not be so long delayed 'as to be in conflict with the rule of relief, that the party asking to enforce a contract against another party, must show himself to have been ready, willing and prompt in executing the contract on his part, or show some sufficient excuse for his own delinquency. Otherwise he will have failed to show such a doing of equity, as to justify him in asking it in a court of equity.
By the terms of the promissory note, as we have seen, the $2000, with interest from the 7th day of December, 1821* were to have been paid on the 1st day of April, 1828. And the contract so made, and signed and sealed by the parties, expressly provided that, if the money should not be paid at the time specified in the note, all claim whatsoever to the premises, so conveyed to him, either in law or equity, should be abandoned by said Piatt unto him, the said Smith, his heirs and assigns.
The present action was not commenced until twenty-seven- *571 years after the time thus fixed for the payment of the money; and no tender or offer to pay the money has even as yet been made; but an account is now asked for rents and profits, extending back over a space of time of more than a quarter of a century. That this is an almost unprecedented delay on the part of complainants seeking relief in a court of equity, must be admitted. How is it explained so as to avoid the objection of great laches, and staleness of claim ?
It is shown that two of the heirs of John H. Piatt, Mrs Frances Dunn, who lived at Lawrenceburgh, Indiana, in the immediate vicinity, and Mrs. Hannah Grandin, -residing at Cincinnati, were femes covert, and so the statute of limitations has never in fact at law run against them.
• It is true, that while the statute of limitations is in its terms only applicable to actions at law, courts of equity act in some cases in obedience to rules'of law; and in many cases in relation to equitable titles and estates, courts of equity proceed by analogy to the rules of law, applicable to legal titles and estates. JEquitas sequitur legem is a common maxim. It is said that equity always discountenances laches, and will generally presume laches where it is, by the statute, declared to exist at law. This is the general rule; but there are cases in which courts of equity depart from this general rule, and, as in cases of fraud and trust; standing on special circumstances, grant relief, where, at law, an action would be barred. And so, too, there are cases to be found where a court of equity has refused relief on the ground of laches, where the statute of limitations would not have barred the action at law. But these cases, constituting such exceptions, it has been remarked, stand on special circumstances, of which courts of equity can take notice, when courts of law would be bound by the positive provisions of the statute.
What, then, are the special circumstances of this case, going to show an absence of laches on the part of the two heirs, so-shown to have been femes covert, during the delay of twenty-seven years ? It is not averred that they were fully advised of all their rights, and acquainted with the transactions between the intestate and the said Smith previous to the expir *572 ation of the time mentioned in their contract, in relation to the payment of said loan. Nor is it averred that said heirs were prevented, or in any way hindered from asserting theii rights, by reason of their coverture. But, on the contrary, the proof shows that one of those heirs lived in the city; that her husband, Philip Grandin, was a wealthy and intelligent business man, living in the city, as did the co-heir and administrator, Benjamin M. Piatt; and, so far as the evidence goes, it is to show that her intelligence of her rights, and her ability and facilities for asserting and enforcing her rights were promoted instead of prevented by her coverture. Nor is there anything in the petition or proof to show that the same was not true in regard to Mrs. Dunn, who lived a few miles from the city, and must, in the absence of any averment, or proof to the contrary, be presumed to have been fully apprised of her rights in the premises. While, therefore, it must be admitted that courts of equity, though not within the words of the statute of limitations, are within the spirit and meaning of the statute, there is a large class of cases in which they act merely in analogy rather than in obedience to the statutes. And in all that class of cases in which their action is merely in analogy to the statute, courts of equity will sometimes interpose to prevent the bar of the statute of limitations-; as in cases where the party has perpetrated a fraud, not discovered until at law a bar has arisen under the statute; and there are cases in which it has been held that the positive enactment of the statute, in bar of the legal right, is not allowed to be used in a court of equity against conscience. See the case of Pulteney v. Warren, 6 Ves. 73, and 1 Story’s Eq., sec. 64, where it is said: “ Equity always discountenances laches; and holds that laches is presumable where it is positively declared at law. * * * There are cases in which the statute would be a bar at law, but in which equity would, notwithstanding, grant relief; and, on the other hand, there are cases where the statute would not be a bar at law, but where equity, notwithstanding, would refuse relief.” It may well be doubted, therefore, whether these heirs and their representatives, have, by barely showing themselves *573 within the words of the saving clause of the statute at law, explained satisfactorily their delay for twenty-seven years to assert their claim, consistent with the want of laches. And especially without averring or showing any peculiar equities on their part, or any fraud or wrong on the part of the defendants.
But the case by no means depends upon this question' of laches or staleness of claim.
It is stated in the answer of Smith, and very clearly shown by the proof, that the creditors of John H. Piatt,, and his administrators, were in fact the only parties, at the time the note fell due, who had any real interest in the transaction, as to the loan and land. The estate'of John H. Piatt, at his decease, was largely insolvent; only able to pay some ten or fifteen per cent, on the outstanding claims in the hands of the creditors.
The administrator’s act of January 25,1816, then in force, required the administrators, when appointed, to take an oath or affirmation to discharge with fidelity the duties of administrator according to law. And the law made it the duty of the administrators to “ adjust and settle up the accounts, and claims belonging to the estate, within twelve months,” if practicable; to sell the goods and chattels, as provided by the statute, and from the proceeds to pay the creditors of said estate; and in such a case, where the personal property was insufficient for the payment of the debts, it was made the duty of the administrators to proceed, under the order of the court, to sell the real estate, or so much thereof as necessary, and apply the proceeds to the payment of the debts of the estate.
And with these duties and powers, in the settlement of the estate, the administrators were called upon by Smith with his deed, contract and note, and requested to perform the contract on the part of the intestate, to repay the money loaned, and to accept from him, Smith, a reconveyance of the land. The administrators, at the time, held a duplicate copy of this contract. If the land was of greater value than the price so stipulated to be paid to Smith for the reconveyance, it was their duty to apply to the court for an order to sell, or to redeem the land, and then sell the same and pay the proceeds *574 of the sale to the creditors. If they had concluded to redeem,' and had tendered the amount due upon the note according to-the terms of the contract, and Smith had refused to reconvey, the administrators would be entitled to the full benefit of the contract, whether in the shape of damages to be recovered of' Smith, or by the proceeds of a sale of the lands to be made under a decree of the court upon their application, as assets for the payment of creditors of the estate.
Again, the administrators were the personal representatives of the intestate, whose duty it was to audit, settle and pay, so far as practicable, the claims against the intestate. Here was a transaction somewhat complicated, presented to them as a claim for $2000 and upward, against the estate; and when paid the estate would have its assets increased thereby to the amount of the proceeds of the real estate so to be therefor conveyed by Smith. The administrators, both of them lawyers and friends of the intestate’s family, and one of them, himself an heir, looking at the whole transaction, regarded it optional with them whether to allow the claim as an existing debt, or to abandon said contract, and they acted upon it accordingly. And if such were the character of the claim, and the administrators, by admitting it would evidently incur a liability for the estate to a greater amount than the value of the real estate as assets, it was evidently not only their right, but their duty to refuse to admit the claim, and to abandon the contract.
In the case of the Heirs of Howard v. Babcock, 7 Ohio Rep. 405, the administrators, regarding it for the interest of the estate to abandon an existing contract made by the intestate for the purchase of lands, on which was to be paid, in order to secure a title, the sum of $5000, refused to pay, when requested, as did the administrators in this case. But in that case the. debt being undoubtedly one that could be made obligatory against the estate, and the administrators thinking, as did these administrators, that the lands would not as assets amount to as much as the money in their hands, and that the assets would otherwise be insufficient to pay all the debts, adjusted the claim with the holders, by paying *575 them three hundred dollars to cancel the contract; and the agreement of cancellation was thereupon indorsed upon the written contract, and subscribed, by the administrators ; and this too without the knowledge of the heirs. Within three- or four years thereafter, the heirs of Howard asserted their rights by petition in chancery as the real representatives, to-whom belonged the interests of Howard in said lands, as expressed by said contract. And although the lands were in that case shown at the time of the pendency of the suit by the heirs, to be of the value of forty thousand dollars; yet the court held that inasmuch as the administrators had acted in good faith, and made an arrangement to rescind the contract for the purchase of the lands, at the time made, apparently beneficial to the estate, chancery would not aid the heirs to again set up the contract so canceled by the administrators. The court in that case very properly looked at the circumstances and the value of the property at the time when the-administrators so abandoned and rescinded the contract, and-finding the conduct of the administrators fair and apparently judicious at the time, the- court held the act of canceling the-contract valid when done; and very properly refused to let the act be annulled in consideration of the after increase of value, and change of circumstances.
But the present is eyen a stronger case than that. In this-case the heirs had no interest in equity or law, except subject to the claim of the administrators, upon such interests, as-assets to pay the creditors; and all the property of the estate, of what name or nature soever, was required as assets, and was found quite insufficient to pay creditors. It was therefore more particularly the right and duty of the administrators to determine upon the wisest and most judicious adjustment of this claim. They did so; and if they erred, the creditors,, who, out of all assets found by the administrators, received only ten or fifteen per cent, of their claims, were the parties to question this exercise of their discretion in the abandonment of the contract so made and subsisting between Smith and the intestate, or the want of strict regularity in the proceeding.
*576 It is said, that the claims against the estate which were not •paid by the administrators, have been bought in or compromised ; but it is denied by the answer of Smith, and there is no proof that after the final interview between Smith and the administrators, in which he urged them, and they refused, to perform the contract, either Smith or they regarded the debt .as subsisting. They told him he must ke.ep the lands, and make the most he could of them ; they regarded, as one of them testifies, the contract as ended and abandoned. Smith went his way, reluctantly it seems-, and ceased to importune the administrators thereafter for the moneybut took possession of the land and sold and conveyed the most of it by absolute deed. The administrators never after recognized the debt to Smith as existing. The heirs as well as the administrators must have known that Smith understood the contract •terminated, and regarded himself as the absolute owner of the land. Nor is there any evidence that any of the heirs in ■their efforts to buy in all the outstanding claims, ever called on Smith to purchase his claim, or in any other way recognized the debt as existing.
Independent of the consideration of the staleness of the •claim of complainants, the facts of this case,' as presented by the pleadings and proofs, do not constitute a case sntitling the complainants to relief in a court of equity.
The petition must stand dismissed at the cost of- complainants.
Peck, Brinkerhofe and Scott, J J., concurred.
Gholson, J., did not sit in this case.